IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
September 28, 2015 Session

## IN RE C.J.A.H.[1]

**Appeal from the Circuit Court for Hamilton County**
**No. 12A183     W. Neil Thomas, III, Judge**

_____

**No. E2013-02131-COA-R3-PT-FILED-NOVEMBER 30, 2015**

_____

T.L. (Father) appeals the trial court's judgment terminating his parental rights with respect to his daughter C.J.A.H. (the Child). The court terminated Father's rights on the ground of abandonment by willful failure to support.[2] It did so after an *ex parte* hearing at which neither Father nor his attorney was present because neither had received notice of the hearing. After subsequent hearings, where Father was present with counsel and introduced evidence, the trial court entered a second order "reaffirming" its earlier termination decision, relying on proof from both the *ex parte* hearing and later hearings. We hold that the trial court erred in relying on evidence presented at the *ex parte* hearing. We further hold that the evidence preponderates against the trial court's finding that Father's failure to pay child support was willful. We reverse the judgment of the trial court and dismiss the petition for termination with prejudice.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Reversed; Case Remanded**

CHARLES D. SUSANO, JR., C.J., delivered the opinion of the Court, in which JOHN W. MCCLARTY and THOMAS R. FRIERSON, II, JJ., joined.

Tiffany M. Campbell, Chattanooga, Tennessee, for the appellant, T.L.

_____

[1] Since this matter involves a minor child in a sensitive type of litigation, we have chosen to use initials to hide the minor's identity and the identity of other individuals involved in her life.

[2] As we will discuss later in this opinion, the trial court, in addition to relying upon the ground of willful failure to support, erroneously relied upon facts that do not constitute a ground for termination of parental rights.

Kevin B. Wilson, Chattanooga, Tennessee, for the appellees, T.S.H. and M.D.H.

**OPINION**

**I.**

The Child was born on September 16, 2009. On January 9, 2012, the State filed a petition in juvenile court on behalf of the Child's mother (Mother) to establish Father's paternity and to set child support. Father testified in the case now before us that he was present in juvenile court each time he was summoned, and that he was willing to work with the court to set child support, but that Mother failed to appear and cooperate. On August 1, 2012, the juvenile court action was dismissed on motion of the State. The rationale for dismissal as set forth in the order was the fact that "[Mother] is not cooperating with our office. The aunt and uncle of the child are currently filing for custody." Because of the State's voluntary dismissal of its petition, there was no court order ever entered requiring Father to pay child support.[3]

In early 2012, Father was on probation from a conviction in a Georgia court for possession of methamphetamines. On January 18, 2012, Father was arrested in Hamilton County and charged with theft of property worth over $10,000. He posted bond on February 4, 2012. Because his arrest and charge violated his Georgia probation, he was returned to incarceration on March 13, 2012. Father remained in jail awaiting trial until July 9, 2013, when the Tennessee criminal case was dismissed on motion of the State.

On September 10, 2012, T.S.H. and wife, M.D.H., (collectively Petitioners), filed the petition in this case, asking the trial court to terminate the parental rights of Mother and Father. They also sought to adopt the Child. M.D.H. is Mother's sister. Attached to the petition was a document styled "waiver of interest," executed by Mother, wherein she stated, "I hereby formally waive any . . . parental rights to the child and execute this document to terminate my rights to this child [and] consent to adoption of this child by my sister and her husband." At a later hearing, Mother testified that she signed the waiver as part of a "verbal agreement that [M.D.H.] will allow me visitation rights." Father answered, denying that he had abandoned the Child and requesting the trial court to appoint counsel for him.

On October 23, 2012, the trial court entered an order, predicated on Father's indigency, appointing attorney Meredith Rambo as his counsel. In the order, the court also appointed a guardian ad litem for the Child. The case was continued by agreed order

_____

[3] A court order is not required to trigger a parent's obligation to support. *In re J.J.C.*, 148 S.W.3d 919, 926 (Tenn. Ct. App. 2004) ("The obligation to pay support exists even in the absence of a court order to do so.").

2

on three occasions. On April 29, 2013, the trial court entered an order, allowing Ms. Rambo to withdraw and appointing attorney Tiffany M. Campbell in her stead. No notice of the substitution of counsel was sent to Father, and he was unaware of it. Although Ms. Campbell was listed on the certificate of service as a planned recipient of the order, she later testified, without contradiction, that she did not receive it and was otherwise unaware of her appointment. A hearing on the petition to terminate and adopt was set for July 3, 2013. Neither Father nor Ms. Campbell had any notice of the hearing.

On July 3, 2013, Petitioners and their witnesses, including Mother, showed up at court ready to proceed. After calling Ms. Campbell's office and getting a recorded message, the trial court proceeded with the hearing in the absence of Father and his counsel. Petitioners presented their case. No court reporter was present, so there is no transcript of the *ex parte* hearing.

On July 11, 2013, Ms. Campbell filed a notice of "limited appearance as counsel of record" for Father, and a "motion for instructions" on his behalf, stating as follows:

> While Attorney Rambo did not file a Motion to Withdraw as Father's counsel or give notice to Father of her intent to withdraw from this case, the Court entered an Order entitled "Substitution of Counsel" filed by Attorney Rambo substituting Attorney Tiffany Campbell in her place on April 29, 2013.
>
> Attorney Rambo did not notify Father of the substitution of Attorney Campbell as his counsel of record, as Father was clearly excluded from the Certificate of Service attached to the Order entitled "Substitution of Counsel."
>
> Father did not receive actual notice of Attorney Rambo's withdrawal from this case until July 5, 2013.
>
> Despite the Certificate of Service signed by Attorney Rambo indicating that she mailed the Order entitled "Substitution of Counsel" to Attorney Campbell, Attorney Campbell never received the Order and never approved the Order for entry as "acceptance" of this substitution of counsel.

*　　*　　*

Father asks the Court to properly appoint Attorney Tiffany M. Campbell as his counsel of record, [and] respectfully requests instructions from this Honorable Court as to the status of the appointment or "substitution" of Attorney Tiffany M. Campbell as his counsel of record in this cause.

(Numbering in original omitted; word "Respondent" in original replaced by "Father" throughout.)

On August 20, 2013, the trial court entered an order addressing the "motion for instructions:"

This cause came to be heard on the 22nd day of July, 2013. . . upon the Motion for Instructions filed by counsel for [Father] . . . . After statements by counsel, the Court finds that the Motion for Instructions is well-taken. It appears to the Court based upon the Affidavit of Indigency filed in this cause that the Respondent, [Father], is entitled to court-appointed counsel[.]

Tiffany M. Campbell is appointed as counsel for [Father] . . .

*    *    *

This Order shall be effective as of the date of entry of the original "Substitution of Counsel," which was April 29, 2013.

On August 15, 2013, five days before its order addressing the motion for instructions, the trial court entered an order styled "final decree of adoption and termination of parental rights" containing the following findings of fact and conclusions of law in pertinent part:

This matter came before the Court on the 3rd day of July, 2013, upon the Petition for Adoption filed on September 10, 2012, by [T.S.H.] and [M.D.H.] to adopt [Child].

*    *    *

At the scheduled time for hearing on this matter neither Respondent [Father] nor his counsel appeared. A phone call was placed to Ms. Campbell's office and a recording

4

indicated the office was closed until July 8, 2013. Petitioners were present with their attorney and Megan England, the guardian ad litem for the child, was present. The Petitioners put on their proof in the form of testimony from [M.D.H.] and records subpoenaed from the Child Support Division of the Juvenile Court. The guardian ad litem gave her report based on interviews with the Petitioners and a meeting with Respondent [Father]. The guardian ad litem had made a home visit with Petitioners and the child to be adopted and reviewed the complete record. She stated that [Father] was incarcerated, had no existing relationship with [the Child], and had never supported [the Child]. It was her opinion that the termination of the parental rights of the biological parents of [the Child] and her adoption by Petitioners was in the best interests of [the Child].

The testimony of [M.D.H.] was that [the Child] had spent a lot of time with her and her husband even prior to the filing of this Petition as [the Child's] mother, who is the sister of [M.D.H.], lives a transient lifestyle with substance abuse issues and often depended on Petitioners for support and care for [the Child]. [M.D.H.] also testified that Respondent [Father] has no relationship with [the Child], that she has never known of any support he has provided for [the Child] and that he has a lengthy criminal record including convictions in both Georgia and Tennessee. She further testified that she and her husband had children separately prior to marrying each other and that those children are no longer living with them. She testified that they are both employed and own their home and are able to provide for [the Child]. She further testified that in the summer of 2012, [Mother] brought [the Child] to her and her husband and said she wanted to give [the Child] up to them for adoption as she was not able to care for her. . . . [The Child] has lived with them basically as their child for a year now, [M.D.H.] testified.

From a review of the entire record and the sworn testimony of [M.D.H.] and a review of the complete subpoenaed records from Juvenile Court, and the statements of the guardian ad litem and counsel for Petitioners, the court makes the

following findings of fact and conclusions of law.  The Court finds that the biological father and mother, Respondents herein, have either been served or joined in this Petition as a Co-petitioner ([Mother]) and chose to voluntarily relinquish her parental rights and responsibilities and has signed the Petition and the attached "Waiver of Interest" as required by law and has received notice of the hearing and has not appeared.  The Court further finds that the record reflects that all the procedural steps have been fulfilled and that the pleadings are in order to allow this Court to terminate the parental rights of [Father].  The Court further finds that [Father] has failed to support [the Child] and that such failure has continued throughout the life of the child, who was born on September 16, 2009. . . . The Court further finds that [Father] has no relationship with [the Child] and did not have a relationship with her before he was incarcerated in March of 2012 in Hamilton County, where he presently remains awaiting an adjudication of a felony theft charge and then extradition to Georgia on a parole violation of a felony drug charge in Floyd County.

Based on the foregoing findings of fact, the Court makes the following conclusions of law.  [Father] has legally abandoned the child and his rights as a parent of [the Child] are accordingly subject to termination.  Respondent [Mother] has voluntarily given up her rights as a parent of [the Child] and consented in the manner required by law to the termination of her rights by this Court.  [The Child] is accordingly a child suitable and available for adoption and Petitioners are suitable parents to adopt her as their child and provide her the love and care she needs. . . .  Given that the time that [the Child] has been living with Petitioners as their child is approximately one year, and the fact that the guardian ad litem made a home visit to Petitioners' residence and recommends the adoption of the child by Petitioners, the Court waives the six-month waiting period, the orders of reference, the preliminary home study and home study, the order of guardianship or custody, and the final court report and concludes that it is appropriate to make this Decree of Adoption final.

Based on the foregoing findings of fact and conclusions of the law it is accordingly ORDERED, as follows:

1. The rights of [Mother and Father], as parents of [the Child] are terminated as are their responsibilities. There are no other individuals or entities required to consent to this adoption or to have their rights terminated.

2. Petitioners . . . are and shall, from this day forward, be the legal parents of [the Child] with all legal rights and responsibilities as her parents.

(Capitalization in original.)

On August 29, 2013, Father filed a motion to set aside the trial court's order. Father alleged, among other things, that the Petitioners, their counsel, and the guardian ad litem all knew that Father was incarcerated.[4] He insisted that he had no knowledge this matter was to be heard on July 3, 2013. On September 13, 2013, Father amended his motion to set aside, further alleging, in pertinent part, as follows:

In the Petition for Adoption filed by the Petitioners, the Petitioners raise only the ground of "abandonment through non-support" as the basis to terminate Respondent's parental rights.

*     *     *

In order for a court to find abandonment by failure to support, it must determine that the parent's failure was "willful." *See In Re Swanson*, 2 S.W.3d 180, 184-85 (Tenn. 1999). Failure to pay support is "willful" if the parent "is aware of his or her duty to support, has the capacity to provide the support, makes no attempt to provide support, and has no justifiable excuse for not providing the support." *In Re J.J.C.*, 148 S.W.3d 919, 926 (Tenn. Ct. App. 2004).

*     *     *

---

[4] Petitioners' initially-filed petition in this case alleges that Father "is believed to be currently residing in the Hamilton County jail." Father's answer states, "I have been incarcerated in Hamilton County jail since 3/13/2012."

7

. . . the Petitioners failed to present any evidence and the Court made no finding that [Father] "willfully failed" to make reasonable payments toward the support of the child during the requisite four (4) consecutive months immediately preceding the filing of the Petition for Adoption.

The minor child was left in the Petitioners' care on July 13, 2012, which was less than two months preceding the filing of the Petitioners' Petition for Adoption.

Per the Final Decree of Adoption entered by the Court, the only proof presented was the testimony of the adoptive mother, [M.D.H.], who had no personal knowledge of what, if any, support had been paid by [Father] prior to the minor child being placed with her on July 13, 2012.

While the Final Decree of Adoption states that [Father] had no relationship with the minor child, the Petitioners failed to mention that the minor child and biological mother lived with the [Father] and the [Father's] late mother for a period of time shortly before [Father's] incarceration.

If [Father] had been allowed to participate in the hearing, [Father] would have offered proof of his relationship with the minor child through the testimony of multiple witnesses, photos, and videos, all of which the Petitioners, Petitioners' counsel, and the guardian ad litem were aware of prior to the July 3, 2013 hearing.

*     *     *

Even if the Petitioners had established that it would be in the best interests of [the Child] to terminate the parental rights of [Father], the Petitioners failed to present clear and convincing evidence that [Father] abandoned [the Child] by willfully failing to support the minor child. . . .

The Final Decree of Adoption and Termination of Parental Rights should be set aside based on the fraud, misrepresentation and misconduct on the part of the Petitioners. Further, it should be set aside due to improper

8

procedure and the Petitioners' failure to prove by clear and convincing evidence that [Father] abandoned the minor child as required by Tennessee law.

WHEREFORE, [Father] respectfully requests this Honorable Court to set aside the Final Decree of Adoption and Termination of Parental Rights entered by the Court on August 15, 2013 and to set this cause for a full hearing to afford [Father] due process of law.

(Capitalization in original.)

On September 13, 2013, Father also filed a motion to alter or amend the trial court's order of August 15, 2013. He amended that motion on September 19. The motion, as amended, alleged similar grounds to his motion to set aside. The trial court did not set aside its judgment order of August 15, 2013, nor did it alter or amend that order. The court did, however, set a hearing date for the parties to present evidence regarding Father's motions. The trial court made it clear that it would allow the parties to present any witnesses and proof they wanted, because the court stated that "I don't want anybody claiming they didn't have a full opportunity to have a hearing." Several days of testimony ensued. Father testified and presented other witnesses and evidence.

On November 26, 2014, the trial court entered its final order stating in pertinent part:

This matter came to be heard on March 4, 2014 and again on August 26th and 27th, 2014, upon Father's Motion to Alter or Amend, and all other matters pending before the Court. The Court allowed testimony of all parties and other witnesses related to Father's Motion to Alter or Amend.

After hearing the testimony of all parties and witnesses, reviewing the record, hearing the argument of counsel including the guardian ad litem, and upon a review of legal authorities submitted by both parties and the guardian ad litem, the Court made the following findings of fact:

The petition filed in this matter alleges that Father abandoned [the Child] by failing to pay support and failure to maintain a relationship with her and accordingly Father was given

sufficient notice as to the basis for the termination of his parental rights.

. . . The Court must find by clear and convincing evidence that Father abandoned his child by (1) failure to support, and (2) failure to maintain a relationship. The Court finds that as to both bases, there was clear and convincing evidence to support the claim by Petitioners that Father abandoned the minor child. The evidence showed that over the life of [the Child] for 2 1/2 years prior to Father's incarceration, he had at the most contributed around $100.00 in support to the [Mother]. Furthermore, the testimony showed that in the four months preceding Father's incarceration in the months of February and March, 2012, he had not contributed any support to [the Child] but he did take some used books to [Mother's] residence on or about Christmas Eve in December 2011. Additionally, there was proof that on that occasion, Father had quarreled with [Mother] (they were both intoxicated) at her residence and he left promptly. There was no evidence presented that showed Father had seen [the Child] after the summer of 2011 prior to the brief encounter on Christmas Eve 2011.

The Court finds by clear and convincing evidence that Father was able to maintain some sort of standard of living for himself as he was able to maintain some sort of drug use during the time in question before he went to jail, and he was able to buy, according to his testimony, a $2000.00 metal detector, although there is a question, based on the child's mother's testimony, as to whether he bought it or stole it. There was evidence that during the first two and a half years of [the Child's] life that Father was not incarcerated and that he was able to purchase a motorcycle which he apparently wrecked. The Court, from the foregoing evidence found that Father had the ability to pay child support and willfully did not do so.

\*     \*     \*

The testimony at trial was that [the Child] lived with Petitioners since July of 2012, over two years as of the date of

the hearing. [The Child] came to live with [P]etitioners because [Mother and Father] were unable to care for the child. Both [Mother and Father] admitted in open court that during that time, they struggled with substance abuse and could not care for [the Child]. [Mother] left [the Child] with Petitioners at that time because she felt it was in [the Child's] best interest for the Petitioners to adopt and raise [the Child]. Subsequently, Mother joined in the Petition for Adoption.

At the hearing, the Court heard testimony from several witnesses, including [M.D.H.] that [the Child] was thriving in her new home and was well adjusted. The Court also reviewed and heard argument of the guardian ad litem and testimony of the guardian's investigation and the Court found that it was in the best interests of [the Child] that the parental rights of Father be terminated and that Petitioners be allowed to adopt the child. The Court specifically found that petitioners were able and willing to love and provide for [the Child] and in fact had been doing so for over two years. The Court found that the minor child had established very well connected bonds with the Petitioners, that she viewed the petitioners as her parents, and that she did not know of any parental relationship with [Mother and Father]. The Court found that it would be disruptive to remove [the Child] from the stable home environment provided by the Petitioners and that it would not be in [the Child's] best interest to interrupt the relationship she had established with Petitioners. The evidence showed that [the Child's] life with [Mother] was chaotic and transient until she was placed with Petitioners. Additionally, [the Child] had only seen [Father] a few times in her life and had never established a bond with [him]. Due to lack of support from Father and [Mother's] personal struggles, Petitioners had cared for [the Child] on a regular basis over the first two and 1/2 years of her life. There was some testimony from witnesses and [the Child's] parents that Father's mother had cared for and assisted [the Child's] care on occasion but Father's mother passed away in 2012.

The Court found, from all of the evidence before it, that there was abundant evidence of abandonment by Father from both the standpoint of support and the lack of a meaningful

11

relationship with [the Child]. The Court further found that [Mother], co-petitioner herein, had voluntarily agreed to the termination of her rights.

The Court further found that the evidence clearly showed that it was in [the Child's] best interests to terminate the parental rights of both . . . Mother and Father.

The Court previously entered a Final Order in this matter on August 20, 2013, following the hearing on July 22, 2013,[5] and this hearing was technically on Father's Motion to Alter or Amend the Order, and multiple amendments to that Motion,[6] based on "the fraud, misrepresentation and misconduct of the part of the Petitioners." The Court found that there was no fraud, misrepresentation or misconduct on the part of Petitioners or their attorney, but the Court did indicate there was more than likely excusable neglect under the circumstances of Father's change of counsel prior to the hearing in July, 2013.

However, while the Court has made additional findings of fact, due to the additional evidence that was presented to the Court in the multiple hearings on Father's Motions, the Court finds that the evidence submitted to the Court in the July 22, 2013 [*sic:* July 3, 2013],[7] hearing was sufficient to terminate

[5] The court order entered August 20, 2013 is in the record. It plainly pertains only to Father's "motion for instructions" and the appointment of Ms. Campbell as his counsel. Similarly, the hearing on July 22, 2013, involved only the issue of Ms. Campbell's proper appointment and the resolution of the "motion for instructions," according to the language of the August 20, 2013 order. The August 20, 2013 order is not designated a "final order."

[6] Father's motion to alter or amend was filed on September 13, 2013. His motion to set aside the first order terminating his rights, and resulting from the *ex parte* hearing, was filed August 29, 2013. Consequently, the trial court's order entered August 20, 2013, could not have addressed these motions, as they had not yet been filed.

[7] As footnote five explains, there was no testimony or other evidence presented regarding the merits of the petition to terminate Father's parental rights at the July 22, 2013 hearing. That hearing only involved the "motion for instructions," as stated in the trial court's August 20, 2013 order. Our review of the record indicates that the reference to the "July 22, 2013 hearing" is a typographical error and the court was clearly referring to the testimony presented at the *ex parte* hearing of July 3, 2013.

12

Father's parental rights. The fact that there was additional and more specific evidence from Father, [Mother], and other witnesses of the lack of a relationship and the lack of support from Father, merely reinforces what the Court originally found to be the case in July of 2013. The additional evidence was submitted by all parties and was considered by the Court not only as to whether the Order should be amended or altered but also as to whether in fact there was an abandonment and whether it was in [the Child's] best interests to have her biological parents' rights terminated and Petitioners allowed to adopt [the Child] as their child. Although the case took a circuitous route due to Father not appearing at the July 22, 2013 [*sic:* July 3, 2013] hearing, all Parties have had the chance to fully and completely present their case and answer the allegations made in all Pleading[s] and Motions before the Court.

Any other Motions made by Father which have not been expressly ruled on in this Order are hereby denied. Based on all of the foregoing findings of fact and conclusions of law, the Court hereby ORDERS, that the rights of . . . [Mother and Father] . . . are hereby terminated.

(Numbering in original omitted; footnotes added; Father's surname and "Respondent" in original replaced with "Father" throughout.) Father timely filed a notice of appeal to this Court.

## II.

Father raises the following issues, as taken verbatim from his brief:

1. Whether the trial court erred by failing to set aside the . . . judgment entered against the Father at the [*ex parte*] hearing on July 3, 2013[,] and, as a result, denied the Father the right to present evidence as to the merits of the petition.

2. Whether the trial court erred in finding clear and convincing evidence for the ground of abandonment for failure to support and for failure to maintain a relationship with the child.

13

3. Whether the trial court erred in finding clear and convincing evidence that terminating Father's parental rights was in the best interest of the child.

## III.

With respect to parental termination cases, this Court has observed:

> It is well established that parents have a fundamental right to the care, custody, and control of their children. While parental rights are superior to the claims of other persons and the government, they are not absolute, and they may be terminated upon appropriate statutory grounds. A parent's rights may be terminated only upon "(1) [a] finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and (2) [t]hat termination of the parent's or guardian's rights is in the best interest[ ] of the child." Both of these elements must be established by clear and convincing evidence. Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable, and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence.

*In re Angelica S.*, No. E2011–00517–COA–R3–PT, 2011 WL 4553233, at *11–12 (Tenn. Ct. App. E.S., filed Oct. 4, 2011) (citations omitted).

On our review, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed de novo upon the record accompanied by a presumption of correctness unless the preponderance of the evidence is against those findings. *Id.*; Tenn. R. App. P. 13(d). Great weight is accorded the trial court's judgment of witness credibility, which determinations will not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002). Questions of law are reviewed de novo with no presumption of correctness. *Langschmidt v. Langschmidt*, 81 S.W.3d 741, 744-45 (Tenn. 2002). We proceed mindful that only a single statutory ground must be clearly and convincingly established in order to justify a basis for termination. *In re Audrey S.*, 182 S.W.3d 838, 862 (Tenn. Ct. App. 2005).

The petition alleges, and the trial court found, that Father's parental rights should be terminated on the ground of "abandonment through . . . not establishing or maintaining a relationship with the child." There is no such statutory ground for termination of parental rights. Tenn. Code Ann. § 36-1-102(1) (2014) specifically defines "abandonment" for the purposes of terminating parental rights in order to make the child available for adoption. The General Assembly has not defined "abandonment" as "the failure to maintain a relationship with a child." Moreover, Tenn. Code Ann. § 36-1-102(1)(G) expressly provides that " 'Abandonment' and 'abandonment of an infant' do not have any other definition except that which is set forth in this section, it being the intent of the general assembly to establish the only grounds for abandonment by statutory definition." Consequently, the only valid ground for termination at issue in this case is abandonment by willful failure to support the Child. Because Father was incarcerated during part of the four months prior to the filing of the petition, the applicable definition of "abandonment" provides as follows:

> (1)(A) For purposes of terminating the parental . . . rights of a parent . . . of a child to that child in order to make that child available for adoption, "abandonment" means that:
>
> \*       \*       \*
>
> (iv) A parent . . . is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent . . . has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's . . . incarceration[.]
>
> \*       \*       \*
>
> (B) For purposes of this subdivision (1), "token support" means that the support, under the circumstances of the individual case, is insignificant given the parent's means;
>
> \*       \*       \*

15

(D) For purposes of this subdivision (1), "willfully failed to support" or "willfully failed to make reasonable payments toward such child's support" means the willful failure, for a period of four (4) consecutive months, to provide monetary support or the willful failure to provide more than token payments toward the support of the child;

Tenn. Code Ann. § 36-1-102(1)(A)(iv), (B), (D).

The Supreme Court has recently provided the following guidance on the ground of abandonment, stating in pertinent part,

> To prove the ground of abandonment, a petitioner must establish by clear and convincing evidence that a parent who failed to visit or support had the capacity to do so, made no attempt to do so, and had no justifiable excuse for not doing so. *In re Audrey S*., 182 S.W.3d 838, 864 (Tenn. Ct. App. 2005). Whether a parent failed to visit or support a child is a question of fact. Whether a parent's failure to visit or support constitutes willful abandonment, however, is a question of law. *In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007). . . .
>
> We begin our analysis with the ground of abandonment based on willful failure to support. Willful failure to support or to make reasonable payments toward support means "the willful failure, for a period of four (4) consecutive months, to provide monetary support or the willful failure to provide more than token payments toward the support of the child." Tenn. Code Ann. § 36–1–102(1)(D). A parent cannot be said to have abandoned a child when his failure to visit or support is due to circumstances outside his control. *See In re Adoption of A.M.H.*, 215 S.W.3d at 810 (holding that the evidence did not support a finding that the parents "intentionally abandoned" their child). A parent may not attempt to rectify abandonment by resuming payments of support subsequent to the filing of "any petition" seeking to terminate parental rights or seeking to adopt a child. Tenn. Code Ann. § 36–1–102(1)(F).

*In re Adoption of Angela E.*, 402 S.W.3d 636, 640 (Tenn. 2012).

16

Father argues that his failure to pay child support was not willful and that Petitioners failed to present clear and convincing evidence that it was willful. Tennessee courts have repeatedly emphasized the importance of a trial court's finding that a parent's conduct is willful when abandonment is alleged as a ground for termination of parental rights. *See, e.g., **In re Alysia S.**,* 460 S.W.3d 536, 565 (Tenn. Ct. App. 2014) (" 'The requirement that the failure to visit or support be "willful" is both a statutory and a constitutional requirement.' . . . Therefore, the element of willfulness is essential and central to the determination of abandonment"); ***In re M.L.D.***, 182 S.W.3d 890, 896 (Tenn. Ct. App. 2005); ***In re Audrey S.***, 182 S.W.3d at 863–64 (The concept of "willfulness" is at the core of the statutory definition of abandonment. . . . [T]riers-of-fact must infer intent from the circumstantial evidence, including a person's actions or conduct.").

In this case, Father was incarcerated on January 18, 2012, was out of jail briefly, and returned to incarceration on March 13, 2012, where he remained for over a year until the State dismissed his criminal case on July 9, 2013. The petition to terminate was filed on September 9, 2012. The pertinent four-month period, as defined by statute, is September 18, 2011, through January 17, 2012. The evidence presented regarding Father's ability to pay during those four months was quite scarce. Father testified as follows:

> Q: When did [the Child] and [Mother] reside in your home with you and your late mother?
>
> *        *        *
>
> A: Several different times. I would say to give you an accurate count, I would say at least three times.
>
> Q: At least three times. When was the last time?
>
> A: Three times for at least a week.
>
> Q: When was the last time they resided in your home with you?
>
> A: The last time would be – I'm going to be within a month there. It would be October of 2011.
>
> Q: October of 2011?

17

A: Yes, ma'am.

Q: Okay. And what, if any, help did you offer the biological mother financially to help support [the Child] during her lifetime?

A: From the time [the Child] was born?

Q: Yes. Yes.

A: When [the Child] was first born, I had a motorcycle accident and I broke both of my legs. I mean, it wasn't a simple break. It was serious breaks. I was in a hospital bed and set up at my mother's house. I was in a wheelchair for eight months. That was actually the first six months of [the Child's] life, so I wasn't able to work and I wasn't able to draw disability or Social Security or whatever. But I still came up with money to give [Mother] for support. And, you know, I never asked – I never asked for receipts. I don't have any receipts, but there for the first couple of three or four months, I gave her money almost every week.

Q: And what, if any, necessities did you help purchase for [the Child], like diapers or clothing or any money for those items?

A: Other than the money, yes, I gave those other items also as well as clothes, diapers, whatever, support, love, a place to stay. And my family, not just my mother, but my sister.

\*        \*        \*

. . . I went to the Maximus[8] several times to say that I was the father of that child and work out arrangements on setting up plans to pay child support.

Q: But you never did?

---

[8] Although not specified or defined in the record, it appears that "Maximus" is a company that aids in the administration and provision of child support services in Hamilton County.

A: Yes, sir. I showed up three times.

Q: No. I said you never paid support. It was never established?

A: Yes, sir. It was never ordered for me to pay it, but I paid it.

Q: Well, why in the world do you have to order it to pay it?

A: I'm just saying you don't. I was paying it anyway. It wasn't ordered, but I was paying it.

Q: Then you have proof of the checks, don't you?

A: No, sir, I don't.

Q: You don't?

A: It wasn't checks. It was cash.

                    *       *       *

Q: So when you go to [juvenile] court then, why don't you say the child is mine, I want to pay all the support I haven't paid?

A: I actually went to court the day before I was incarcerated. I was in court and she didn't show up. I was there then to say, yes, I'm the baby's father.

Q: So why didn't you do that in court in May?

A: Because she didn't show up.

Q: What does that have to do with it?

A: Well, they wouldn't have a hearing without her.

                    *       *       *

19

Q: To your knowledge, what was the reason why the Court did not set support at that time?

A: Because the mother – they were angry at the mother for being – I forget the word they used. They were saying she was being uncooperative. She didn't care if the child went forward, but that she did order me – when I was released to go to the Maximus and take a state-administered DNA test. But, you know, as I said, in the beginning before it even got to the court, Maximus had been sending those letters having us to come there to set down and see if we could work something out and get an order of support before it went down there. I showed up three times and the mother wasn't there and they wouldn't – we can't agree on it if there's not two people there. If there's only one, it would be an easy agreement. I would give them $10 a week or $100 a week, but they wouldn't go forward because she was never there. I couldn't volunteer and say, you know, I know this lady has a kid and it's mine, can I set it up and pay child support on it. You know, maybe I could have done it that way. I don't know. I was showing up every time somebody requested I show up to see about support of my child.

The juvenile court record and Mother's testimony corroborate Father's testimony that he appeared in juvenile court on March 12, 2012, and Mother did not. Moreover, as already noted, the juvenile court action was dismissed on motion of the State because of Mother's failure to cooperate and because Petitioners were preparing to file their petition to adopt.

Father further testified as follows:

Q: So you never really supported [the Child]. Who supported [the Child]?

A: I did.

Q: Well, you just said you didn't.

A: No. I said I was unable to support her. And as I said in the beginning a while ago, I supported her even though I wasn't working. I was still coming up with money for her every week or bi-weekly at the worst.

20

Q: Well, you wouldn't come up with money. Somebody else was coming up with money.

A: No, sir. I was selling my possessions so that I could give them some money because I couldn't work and I couldn't draw a check.

* * *

A When I first – you know, when we first did the DNA test and everything and I found out that [the Child] was mine, I started paying [Mother] every week for the first couple of months. And then, you know, anytime that [Mother] called and wanted money, I either gave it to her or she worked with my mother. I would tell her to get it from my mother and I would give it back to my mother when she gets home or whatever. And, you know, then [Mother and the Child] come and stayed with me several times for days or weeks at a time, stayed at the house and I took care of them while they were there.

Q And at any time did the [Mother] ever approach you requesting financial assistance?

A: Oh, yeah, regular.

Q: And what was your response to [Mother's] request?

A: I don't think I ever denied [Mother] when she asked. I have always came up with the money somehow.

Q: Okay. How did you come up with money?

A: I was selling stuff that I – I was in a wheelchair. I had been in a motorcycle accident, so I wasn't working. I was at first and that's how I was paying her every week. But then after the accident, I was selling my belongings to give [Mother] whatever she needed.

21

Q: And could you describe an occasion when [Mother] came to you to ask for financial assistance?

A: [Mother] didn't come to me. [Mother] called me and I was in Rome and I told – she needed some money. I can't remember what for, but she needed money. I said, fine. I said, you can go by my place at mom's. I said, as soon as you open the front door, there's a $2,500 metal detector laying there as soon as you open the door. I said, get it, take it to the pawnshop, whatever you've got to do. I said, there's your money right there. I called my sister to tell her [Mother] was coming. So she sent her to my house. [Mother] knew what she was doing and she came out and got it and got the money or whatever.

Q: And you said your sister was aware of that incident?

A: Yes. She actually came out and talked to [Mother].

*       *       *

Q: Okay. Let's start back. This happened in December of 2011; is that right? Were you employed at the time?

A: Yes, sir.

Q: Okay. Where were you employed?

A: Chasler, Incorporated.

Q: Okay. So you were sending child support to [Mother]?

A: Yes.

Q: Okay. Where are your checks?

*       *       *

A: I don't know. I don't have proof of it.

Q: You don't have any receipts?

22

A: No, sir.

Father's sister testified as follows:

Q. Have you ever received a phone call from your brother requesting that you unlock his camper so that [Mother] could get something out of it?

A. Yes, I have.

Q. Could you please describe when that happened?

A. I'm not sure when it happened, but he had called me one day and he said, are you at home? And I said, yeah, what's going on? And he said, I'm not there, he said, and [Mother] needs to get in the camper to get some stuff. And I said, okay. He said, just let [Mother] in, let her have whatever she wants. And I said, okay.

Q. And so you unlocked the camper?

A. I unlocked the camper and let [Mother] in.

Q. And did you stay there while [Mother] removed things from the camper?

A. No, but – I mean, I was not there when [Mother] got there and got the stuff, no.

Q. But you did unlock it for [Mother]?

A. Yes, I did.

Q. Did you ask your brother why [Mother] needed access to the camper to retrieve these items?

A. He said that [Mother] was needing some money, and he said he had some stuff in the camper that [Mother] could get.

*        *        *

23

Q. Did you ever witness [Father] give any financial assistance to [Mother]?

A. Yes, I have.

Q. Where and when?

. . . A. I went down to his house and handed them the money, because he needed extra money – she needed like $100-something, I don't remember the exact amount, and he said, do you have another – he said, I don't have what she's asking, can I have another 20, do you have it? And I said, I will give you $20 to go with your money.

Q. Speaking to you?

A. Yes.

Q. He was speaking to you?

A. And I went down there and give him the money and he turned around and handed it to her.

Q: Do you know what year that was?

A: No, I do not.

Mother testified in pertinent part as follows:

Q. As you are aware in your interactions with [Father], based on what he told you, how did he get money?

A. Here and there and everywhere, I guess.

Q. Legally or illegally?

A. Maybe some was legal and some wasn't. . . . But, I mean, I didn't get any of it. . . . I'm just saying I don't know what [Father] had, I don't know how much money he –

24

Q. Do you know where [Father] got his things?

A. No, I don't know. I just know that – I just – I just know I didn't – he didn't support us. Okay?

Q. Did you ever live with [Father]?

A. I stayed at his mother's for a couple of days, maybe spent the night with him maybe a couple of nights . . .

        \*        \*        \*

Q. Did [Father] give you anything [on Christmas of 2011]?

A. He brought some books.

Q. What kind of books?

A. They were nice books, but they had writing in them from some other – somebody to some kid in them that I knew that he didn't buy.

Q. What did he bring those books for?

A. Because he wanted to see [the Child] and bring those books in to see me, I'm sure.

Q. Did he give you any money at that time?

A. No.

        \*        \*        \*

Q. Tell me what happened in the months leading up to Christmas 2011, if you recall it, as far as [Father], what he did or didn't do.

A. Well, there's not much to say about what he did do. We just didn't have very much contact. Like I said, if it was convenient for him, then, you know, he wanted to see me.

25

*　　*　　*

Q. Okay.  And let's go back to Christmas 2011.  Do you recall the last time prior to that that he would have given you any support?

A. I counted up, I think I got $40 once.

Q. What year?

A. Oh, I can't remember.  I'm so sorry, I can't recall.  And then I think his mother gave me $60 once.  And then I got a metal detector.

*　　*　　*

Q. Okay.  Anyway, so the metal detector, tell us about it.

A. Well, he said, I've got a metal detector, if you can find somebody that wants to buy it, because I don't have any money for you.

Q. Do you know where he got it?

A. No, I don't know, but if I was guessing –

Q. Don't guess.  So what did you do with this metal detector?

A. I sold it.

Q. And what did you get for it?

A. 40, $50.

*　　*　　*

Q. In the period of time, and I may have asked you this, but I want to nail it down fairly clearly, going back from, let's say, December of 2011, okay, the Christmas that you talked about, any support that you can recall in the three, four months preceding Christmas of 2011?

26

A. No, sir.

*  *  *

Q. And not that you received anything then, but did you ever receive anything after December 2011 in the way of support for your child?

A. No, sir.

From the evidence in the record, about the only thing we can tell about the four-month period before Father was incarcerated is that he was employed in December of 2011. There is no evidence regarding his income, expenses, assets, debts, or ability to pay. The following is the entirety of the trial court's findings about the willfulness of Father's failure to pay child support, as quoted from its final order entered November 13, 2014:

> The Court finds by clear and convincing evidence that Father was able to maintain some sort of standard of living for himself as he was able to maintain some sort of drug use during the time in question before he went to jail, and he was able to buy, according to his testimony, a $2000.00 metal detector, although there is a question, based on [Mother's] testimony, as to whether he bought it or stole it. There was evidence that during the first two and a half years of [the Child's] life that Father was not incarcerated and that he was able to purchase a motorcycle which he apparently wrecked. The Court, from the foregoing evidence found that Father had the ability to pay child support and willfully did not do so.

The evidence preponderates against most of these findings. There was no testimony about Father's alleged drug use in the pertinent four months, nor was there any proof that he had spent money on drugs. Father admitted the following:

Q. And when your daughter was first born and you were with [Mother], you were struggling with substance issues?

A. Yes, ma'am.

Q. And drug addiction, correct?

27

A. Yes, ma'am. Things were really rough till I got past my mother's passing.

Q. And when did your mother pass away?

A. She's been gone three years.

Father also testified that he had been on probation since 2007, was required to submit to drug screening tests, and had always tested negative. There is no evidence in the record regarding who bought the metal detector or when it was purchased. The only evidence about the motorcycle's ownership came from Mother, who testified that it belonged to Father's mother.

At the conclusion of the final hearing, the trial court stated the following:

Let me take you to the last factor in connection with willful, and it bothered me. I was thinking about this last night. The factor of inability to pay and taking into consideration whether it was willful, once it's shown that he didn't pay, whose burden is it to show inability? I think [this is] a fairly important factor in this case. *I don't recall any testimony of his ability to pay one way or the other*, so it leaves me in sort of a quandary.

(Emphasis added.)

The Supreme Court has made it clear that "[t]o prove the ground of abandonment, *a petitioner must establish by clear and convincing evidence* that a parent who failed to visit or support had the capacity to do so, made no attempt to do so, and had no justifiable excuse for not doing so." *In re Adoption of Angela E.*, 402 S.W.3d at 640 (emphasis added). We hold that the evidence preponderates against the trial court's conclusion that Petitioners established, by clear and convincing evidence, that Father abandoned Child by willfully failing to support her.

There is another reason why we must reverse the trial court's decision. It is obvious that the procedure followed at the *ex parte* hearing on July 3, 2012 was fundamentally flawed. Tenn. Code Ann. § 36-1-113(f) provides that "[b]efore terminating the rights of any parent or guardian who is incarcerated or who was incarcerated at the time of an action or proceeding is initiated, it must be affirmatively shown to the court that such incarcerated parent or guardian received actual notice of the

28

following: (1) The time and place of the hearing to terminate parental rights . . ." Petitioners conceded at oral argument before this Court that Father had no notice and was not at fault in failing to appear at the hearing. The testimony at the *ex parte* hearing was not subject to cross-examination, not transcribed by a court reporter, and hence not reviewable. As the Supreme Court has stated,

> It is true that as a general proposition, *ex parte* hearings are disallowed. Indeed, in Tennessee, a judge is prohibited "except as authorized by law," from considering "ex parte or other communications concerning a pending or impending proceeding." Tenn. Sup. Ct. R. 10, Canon 3(A)(4). This is a result of the Due Process guarantee of notice and an opportunity to be heard that is found in both the Fourteenth Amendment to the federal Constitution and Article I, § 8 of the Tennessee Constitution.

*State v. Barnett*, 909 S.W.2d 423, 428 (Tenn. 1995); *see also* *Gamble v. Kelley*, 409 S.W.2d 374, 376-77 (Tenn. 1966).

The trial court refused to set aside its order of August 15, 2012, ostensibly terminating Father's parental rights. In its final judgment order entered November 26, 2014, the court extensively referred to and relied upon evidence proffered at the *ex parte* hearing. Indeed, the trial court specifically found that "the evidence submitted to the Court in the [July 3, 2013], hearing was sufficient to terminate Father's parental rights." This was improper and presented, at a minimum, the appearance of fundamental unfairness and injustice, particularly in a termination of parental rights case.

## V.

As can be seen, the only issue in this case pertains to Father's parental rights. We express no opinion as to who should be the Child's custodian.

## VI.

The judgment of the trial court is reversed, and the petition to terminate Father's parental rights is dismissed with prejudice. Costs on appeal are assessed to the appellees, the Petitioners.

_____
CHARLES D. SUSANO, JR., CHIEF JUDGE

29